**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE FAJARDO**

| | |
|---|---|
| TRIANGLE CAYMAN ASSET COMPANY,<br>Demandante<br>v.<br>AZURE DEVELOPMENT, INC, et al.<br>Demandados | CIVIL NÚM.: NSCI 201500410 |

## SENTENCIA PARCIAL

El 9 de junio de 2015, Oriental Bank [1] presentó una Demanda Jurada (la "Demanda") contra Azure Development, Inc. ("Azure"), y los garantizadores Alfonso Valdés García, Cost Control Company, Inc. y Fideicomiso Valdés Acevedo (conjuntamente, los "Garantizadores") requiriéndole el pago de una suma no menor de $1,026,969.77 por concepto de principal, más la suma de $23,213.90 por concepto de intereses, más los intereses que continúen acumulándose hasta el pago total y completo de la obligación, más la suma de $3,582.74 por recargos, más $175,000.00 por concepto de costas, gastos y honorarios de abogados pactados tras el incumplimiento de la parte demandada con sus obligaciones de repago de ciertas facilidades de crédito.

El 28 de septiembre de 2015, Triangle adquirió de Oriental las acreencias e instrumentos negociables objetos del caso de epígrafe[2]. Consecuentemente, se solicitó la sustitución de parte demandante al amparo de la Regla 22.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 22.3, la cual fue concedida por este Tribunal mediante Orden de 25 de noviembre de 2015, notificada el 10 de diciembre de 2015.

El 1 de diciembre de 2022, Triangle presentó una *Solicitud de Sentencia Sumaria* mediante la cual detalló que, no existe controversia fáctica alguna que impida que este Tribunal dicte sentencia sumaria en contra de los Demandados, Azure, y los Garantizadores. [3]

Evaluados los argumentos vertidos en la *Demanda* y los hechos alegados bajo juramento, de la *Solicitud de Sentencia Sumaria*, este Tribunal determina que no existe controversia sustancial sobre algún hecho material. Por consiguiente, procede utilizar el mecanismo de la sentencia

---

[1] Las facilidades de crédito fueron originalmente otorgadas por el Banco Bilbao Vizcaya Argentaría Puerto Rico ("BBVA"), el cual se fusionó a Oriental Bank ("Oriental") el 18 de diciembre de 2012.
[2] Véase, Triangle Cayman Asset Company v. Azure Development, Inc., 2022 WL 3209645 en 1 (TA).
[3] Azure presentó una petición de quiebras bajo el capítulo 11 (caso núm.23-00462-ESL) ante el Tribunal de Quiebras de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal de Quiebras"), por lo que la acción de cobro está paralizada en cuanto a ella únicamente. La paralización no se extiende contra ningún otro codemandado.

sumaria para disponer parcialmente del presente caso y declarar **Con Lugar** la *Solicitud de Sentencia Sumaria* en contra de los *Garantizadores,* Alfonso Valdés García, Cost Control Company, Inc. y Fideicomiso Valdés Acevedo, a base de las siguientes determinaciones de hechos y conclusiones de derecho:

## DETERMINACIONES DE HECHOS

### A. Contrato de préstamo

1. El 21 de noviembre de 2003, Azure y el BBVA (luego Oriental Bank) suscribieron el *Loan and Security Agreement* ("Contrato de préstamo") bajo el afidávit 1855 ante el notario público Miguel Agustín Blanco Fuertes cuya suma principal ascendía a $1,725,000.00 y tenía como fecha de vencimiento el 31 de agosto de 2004. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 1-3.

2. La sección 8 del Contrato de préstamo identifica la falta de pago como un evento de incumplimiento. Ante un escenario de incumplimiento bajo la sección 8 del Contrato de préstamo, el acreedor puede terminar el contrato, declarar la deuda vencida, líquida y exigible:

> Upon the happening of any Event of Default described above, if such Event of Default shall not have been remedied, the Bank shall be entitled in addition to all other remedies available in equity or at law, or under any Loan Documents or otherwise, y written notice to the Company, to withhold further disbursements of the Loan, and to terminate this Agreement and declare the Loans hereunder to be forthwith due and payable, and the same shall thereupon become due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.

Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 4-5.

3. La sección 10 del Contrato de préstamo dispone que el repago está evidenciado mediante Pagaré hipotecario garantizado, a su vez, por una primera hipoteca. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 6.

### B. Las garantías del contrato de préstamo

#### i. Pagaré hipotecario

4. El Contrato de préstamo fue evidenciado mediante el *Mortgage Note* ("Pagaré hipotecario") por la cantidad de $1,750,000.00, fechado el 21 de noviembre de 2003 bajo el afidávit 67,618 ante el notario público Ernesto González Piñero. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 7-9.

2

5. En cuanto a los intereses, el Pagaré hipotecario dispone que los intereses serán al "rate of Fourteen Percent (14%) PER ANNUM from the date hereof until payment is full". Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 7.

6. El referido pagaré contiene una disposición para el recobro de honorarios de abogados la cual especifica lo siguiente:

> In case the Payee shall take recourse to foreclosure or other judicial proceedings for the collection of all or any part of the principal hereof or any interest hereon, the MORTGAGOR hereby agrees to pay an additional sum of ONE HUNDRED SEVENTY-FIVE THOUSANDS DOLLARS ($175,000.00) as a liquidated amount, without necessity of further liquidation or approval by the Court to cover costs and expenses (including attorney's fees and expenses) of such foreclosure or judicial proceedings.

Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 7.

### ii. **Primera hipoteca en garantía del pagaré**

7. El 21 de noviembre de 2022, Azure y el BBVA otorgaron un *Deed of First Mortgage* ("Escritura de Primera Hipoteca") ante el notario público Ernesto González Piñero mediante la escritura número 132. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 12.

8. Las propiedades gravadas con dicha primera hipoteca son:

**PROPIEDAD I**

**RÚSTICA:** Radicada en el Barrio Mata de Plátanos de Luquillo, Puerto Rico, de forma irregular, con una cabida de doce cuerdas con setecientas catorce milésimas de otra (12.714 cuerdas.), equivalentes a cuarenta y nueve mil novecientos setenta metros cuadrados con seiscientas ochenta y una milésimas de otro (49,970.681 m-), en lindes por el **NORTE,** en catorce (14) alineaciones que totalizan cuatrocientos sesenta y cinco metros con setecientas veinticinco milésimas de otro (465.725 m), con la zona marítimo terrestre que la separa del Océano Atlántico; por el **SUR,** en una alineación de nueve metros con trescientas ochenta y tres milésimas de otro (9.383 m), con el Carlo Embarcadero, en cuatro (4) alineaciones que totalizan doscientos dos metros con seiscientas cuarenta y cinco milésimas de otro (202.645 m), con terrenos de la Familia Pirallo, luego en otras cinco (5) alineaciones que totalizan cien metros con noventa milésimas de otro (100.090 m), con terrenos de la Familia Pirallo, luego en otras tres (3) alineaciones que totalizan sesenta y seis metros con novecientas cuatro milésimas de otro (66.904 m), con terrenos de la Familia Pirallo, luego en una alineación de dieciséis metros con cuatrocientas sesenta milésimas de otro (16.460 m), con terrenos de la Familia Pirallo y en una alineación de ciento cuarenta y seis metros con novecientos cincuenta y seis milésimas de otro (146.956 m), con Half Moon Development Corp.; por el **ESTE,** en dos (2) alineaciones que totalizan cincuenta y tres metros con, quinientas noventa y nueve milésimas de otro (53.599 m), con la zona marítimo terrestre que la separa del Océano Atlántico y en una alineación de dieciséis metros con doscientas treinta y una milésimas de otro (16.231 m), con terrenos de la Familia Pirallo; y por el **OESTE,** en dos (2) alineaciones que totalizan treinta metros con ciento una milésimas de otro (30.101 m), con la desembocadura del Carlo Embarcadero que la separa del Océano Atlántico, en una alineación de veintiocho metros con quinientas sesenta y cinco milésimas de otro (28.565 m), con terrenos de la Familia Pirallo y en otra alineación de dieciséis metros con setecientas cinco milésimas de otro (16.705 m) con terrenos de la Familia Pirallo.

Consta inscrita al folio 220 del tomo 92 de Luquillo, finca 4969 Registro de Ia Propiedad de Fajardo.

**PROPIEDAD II**

**RÚSTICA:** Radicada en el Barrio Mata de Plátanos de Luquillo, Puerto Rico, de forma irregular, con una cabida de cinco cuerdas con setecientas ochenta y dos milésimas de otra (5.782 cuerdas), equivalentes a veintidós mil setecientos veintiséis metros cuadrados con seiscientos noventa y siete milésimas de otro (22,726.697 mc), en lindes por el **NORTE,** en cuatro (4) alineaciones que totalizan doscientos dos metros con seiscientos cuarenta y cinco milésimas de otro (202.645 m), con terrenos de la Familia Pirallo, luego en cinco alineaciones que totalizan den metros con noventa milésimas de otro (100.090 m), con terrenos de la Familia Pirallo, luego en tres alineaciones que totalizan sesenta y seis metros con novecientas cuatro milésimas de otro (66.904 m), con terrenos de la Familia Pirallo, luego en cuatro alineaciones que totalizan sesenta y cinco metros con quinientos treinta y seis milésimas de otro (65.536 m), con Ia Parcela C dedicada a use público y en una alineación de nueve metros con ochocientas sesenta y seis milésimas de otro (9.866 m), con la extensión de Ia Calle D existente; por el **SUR,** en cinco (5) alineaciones que totalizan doscientos noventa y un metros con cuarenta y siete milésimas de otro (291.047 m), con Sucesión Biascoechea y en seis alineaciones' que totalizan doscientos veinticuatro metros con seiscientas setenta y tres milésimas de otro (224.673 m), con el Carlo Embarcadero; por el **ESTE,** en una alineación de sesenta y nueve metros con novecientas veintisiete milésimas de otro (69.927 m), con la extensión de la Calle D existente, en otra alineación de dieciséis metros con setecientas cinco milésimas de otro (16.705), con terrenos de la Familia Pirallo, y en otra alineación de veintiocho metros con quinientas sesenta y cinco milésimas de otro (28.565 m), con dichos terrenos de la Familia Pirallo; y por el **OESTE,** en una alineación de nueve metros con novecientas diez milésimas de otro (9.910 m), con el Carlo Embarcadero que la separa del Océano Atlántico.

Consta inscrita al folio 155 del tomo 106 de Luquillo, finca 5722 Registro de la Propiedad de Fajardo.

Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 13.

9. La carga hipotecaria de $1,750,000.00 está distribuida de la siguiente manera: a la Propiedad I se le asignó una suma de $1,697,500.00 y a la Propiedad II se le asigna la suma de $52,500.00 para un total de $1,750,000.00. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 14.

10. El artículo 5 de la Escritura de Primera Hipoteca establece que esta se otorgó para garantizar y asegurar:

> (i) The total and complete payment of the principal sum of the NOTE;
> (ii) The performance and observance of all the terms and conditions contained in the NOTE, and in this Deed of Mortgage;
> (iii) The performance and observance of all covenants, terms, conditions and agreements contained in any agreement or instrument secured or guaranteed by a pledge of, or a security interest on the NOTE.
> (iv) An additional sum of One Million Two Hundred Twenty Five Thousand Dollars ($1,225,000.00) to cover interest (hereinafter referred to as the "Interest Credit");
> (v) An additional sum of One Hundred Seventy Five Thousand Dollars ($175,000.00) which MORTGAGOR undertakes to pay as liquidated amount without necessity of further liquidation and approval by the Court, to cover costs, expenses and attorney's fees in the event the holder of the NOTE has to take recourse to foreclosure or other judicial proceedings for the collection thereof (hereinafter referred to as the "Credit for Liquidated Damages");
> (vi) An additional sum of One Hundred Seventy Five Thousand Dollars ($175,000.00) to cover any other advances that may be paid by MORTGAGEE pursuant to the terms hereof (hereinafter referred to

4

as the "Credit for Additional Advances"), MORTGAGOR HEREBY CONSTITUTES AND CREATES A VOLUNTARY FIRST MORTGAGE in favor of the MORTGAGEE and of any future holder or transferee of the NOTE, on the following (collectively the "MORTGAGED PROPERTY" or the "Mortgaged Premises")

Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 15.

11. La Primera hipoteca en garantía del pagaré y el Pagaré hipotecario fueron dados en prenda al BBVA de conformidad con la sección 10 del Contrato de préstamo. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 16.

### C. Garantizador solidario de Azure

12. Para garantizar los adeudos de Azure con el BBVA, el 20 de noviembre de 2003 el co-demandado Alfonso Valdés García suscribió un *Guaranty and Agreement* ("Garantía y Acuerdo para Adeudos I"), bajo el afidávit número 1851 ante el notario público Miguel Agustín Blanco Fuertes. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 17.

13. Según la sección 2 del Garantía y Acuerdo para Adeudos I, el Sr. Valdés García se convirtió en el garantizador solidario de Azure. Dicha sección dispone lo siguiente:

> Guarantor [Alfonso Valdes García] jointly and severally with Borrower (solidariamente) unconditionally guarantees the due performance and prompt payment, whether at maturity or by acceleration or otherwise, of all of Borrower's debts and obligations under the Notes and the Loan Documents, together with interest on such debts and obligations to the extent provided for in said documents and all legal and other costs or expenses paid or incurred by Lender in the enforcement thereof against Borrower or Guarantor (all debts, duties, liabilities and obligations herein described and covered by this Guaranty, or intended so to be are hereinafter collectively called the indebtedness), and further unconditionally guarantee that the representations and warranties to be made by Borrower in the Loan Agreement are true as of the date hereof.

Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 17-18.

### D. Enmiendas al Contrato de préstamo

14. El 27 y 28 de mayo de 2010, los co-demandados de Cost Control Company, Inc. y el Fideicomiso Valdés-Acevedo suscribieron un contrato de "Garantía y Acuerdo" ("Garantía y Acuerdo para Adeudos II"), ante el Notario Pedro A. Cantero Frau, bajo afidávits números 3246 y 3250, mediante el cual se obligaron a garantizar solidariamente todos los adeudos pasados, presentes y futuros de Azure con el BBVA. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 19 y 20.

15. En esa misma fecha, los Demandados y el BBVA suscribieron el documento intitulado "Enmienda al Acuerdo de Préstamo y Garantía; Ratificación de Garantía, Acuerdo de Indemnización y Documentos de Préstamo" ("Enmienda I") ante el notario público Pedro A.

5

Cantero Frau, bajo los afidávits 3245 y 3248 respectivamente mediante el cual las partes pactaron que la deuda con el BBVA ascendía a $1,539,000.00 de principal más intereses. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 21 y 22. Además, se extendió la fecha de vencimiento al 31 de diciembre de 2011. Id.

### E. Sustitución de Acreedores

16. El 18 de diciembre de 2012, el BBVA se fusionó con Oriental. Véase, *Moción de Sentencia Sumaria*, Hecho Núm. 24.

17. El 16 de enero de 2014, Azure, Alonso Valdés García, Cost Control Company, Inc., el Fideicomiso Valdes-Acevedo y Oriental suscribieron un *Amendment to Loan and Security Agreement* ("Enmienda II") bajo el afidávit número 14,362 ante Notario Público Juan C. Ortega Torres mediante el cual las partes pactaron incluir que la cuantía adeudada por el principal era $1,175,000.00 y se acordó extender la fecha de vencimiento del préstamo hasta el 31 de diciembre de 2014. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 25-27.

18. El 28 de septiembre de 2015, Triangle adquirió de Oriental las acreencias e instrumentos negociables objetos del caso de epígrafe. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 31-36.

### F. Incumplimiento de los Demandados

19. Los Demandados incumplieron con las obligaciones de pago contraídas al amparo de los documentos de préstamo y garantías entre las partes a pesar de las innumerables gestiones de cobro realizadas por Oriental a partir de la fecha de vencimiento del préstamo, el 31 de diciembre de 2014. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 28-29.

20. Al 15 de octubre de 2022, los Demandados adeudan solidariamente a Triangle un total de $1,713,834.27, dividido entre las siguientes partidas: (i) $1,026,969.77 por concepto de principal; (ii) $487,810.65 por concepto de intereses los cuales incrementan a razón de $235.35 diarios, (iii) $21,124.35 por concepto de recargo; (iv) $175,000.00 por concepto de honorarios de abogados; (v) $644.00 por concepto de pólizas de seguro de la Propiedad Hipotecada y (vi) $2,285.50 en gastos de valoración. Véase, *Moción de Sentencia Sumaria*, Hechos Núms. 37-38.

### CONCLUSIONES DE DERECHO

#### A. Solicitud de Sentencia Sumaria

La Regla 36.1 de Procedimiento Civil dispone lo siguiente:

Una parte que solicite un remedio podrá, en cualquier momento después de haber transcurrido veinte (20) días a partir de la fecha en que se emplaza a la parte

6

> demandada, o después que la parte contraria le haya notificado una moción de sentencia sumaria, pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.

32 LPRA Ap. V, R. 36.1.

Una vez presentada una solicitud de sentencia sumaria, el tribunal dictará sentencia cuando del récord surja con claridad que no existe controversia real ni sustancial sobre algún hecho material y cuando, como cuestión de derecho, proceda que se dicte la misma a favor de la parte promovente. Véase 32 LPRA Ap. V, R. 36.3; Pilot Life Ins. Co. v. Crewe, Martínez, 136 DPR 624, 632 (1994); Rodríguez Lugo v. Srio. de Hacienda, 135 DPR 219, 223-224 (1994); Mercado Vega v. U.P.R., 128 DPR 273, 281 (1991). Además, nuestro Tribunal Supremo ha expresado que el propósito cardinal de la moción de sentencia sumaria es aligerar la tramitación del caso, permitiendo que se dicte sentencia sin necesidad de celebrar una vista en los méritos, cuando de la prueba documental que se acompaña con la referida moción surge que no existe alguna controversia fáctica que dirimir y solo resta aplicar el derecho. Ramos Pérez v. Univisión Puerto Rico, 178 DPR 200, 214 (2010); Tello v. Eastern Airlines, Inc., 119 DPR 83, 8687 (1987); Corp. of Presiding Bishop v. Purcell, 117 DPR 714, 720 (1986).

Al evaluar una moción de sentencia sumaria, el tribunal debe tomar como ciertos aquellos hechos no controvertidos que consten en los documentos y/o declaraciones juradas ofrecidas por la parte promovente. De ordinario, la parte que se opone a que se dicte sentencia sumaria no podrá descansar en sus alegaciones con tal de derrotarla, sino que deberá presentar documentos y/o declaraciones juradas que contradigan la prueba del promovente y demuestren la efectiva existencia de controversias fácticas que ameriten la celebración de una vista. Véase, por ejemplo, 32 LPRA Ap. V, R. 36.5; Jusino v. Walgreens of San Patricio, Inc., 155 DPR 560, 578-579 (2001); Méndez Arrocho v. El Vocero, 130 DPR 867, 873-874 (1992).

### B. Obligaciones y contratos

Los contratos tienen fuerza de ley entre las partes contratantes, las cuales vienen indefectiblemente obligadas a observar sus términos. Véase, Art. 1044 del Código Civil, 31 LPRA sec. 2994. Asimismo, el Artículo 1208 de nuestro Código Civil dispone tajantemente que la "validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes". Art. 1208 del Código Civil, 31 LPRA sec. 3373. Véase, además, BPPR v. Sunc. Talavera, 174

DPR 686, 693 (2008). De otro lado, según los postulados del Código Civil, los contratos se perfeccionan por el mero consentimiento. Véase, Art. 1210 del Código Civil, 31 LPRA 3376. Así, una vez perfeccionado el contrato las partes no solo están obligadas a cumplir lo expresamente pactado, sino que, además, deberán observar las consecuencias que, según la naturaleza de la obligación, supongan la buena fe, el uso y la ley. Véase, Unisys v. Ramallo Bros. Printing Co., Inc., 128 DPR 842, 852 (1991); Ramírez v. Club Cala de Palmas, 123 DPR 339, 345-346 (1989).

Nuestro Tribunal Supremo, por su parte, ha sido enfático al reiterar que, en lo que respecta a las obligaciones contractuales, la ley entre las partes es la voluntad de estas y que los tribunales no están facultados para relevar a una parte de cumplir lo pactado cuando ello es legítimo. Véase, Cervecería Corona v. Commonwealth Ins. Co., 115 DPR 345, 351 (1984); Rivera v. Samaritano & Co., 108 DPR 604 (1979). Por consiguiente, nuestro más alto foro judicial ha resuelto que el cumplimiento de las obligaciones válidamente pactadas no se puede dejar al arbitrio de una de las partes, debiéndose cumplir éstas, pues, según lo acordado. Véase, Art. 1208 del Código Civil, 31 LPRA sec. 3373; Véase, Rodríguez García v. U.C.A., 2018 TSPR 148, pág. 7 (200 DPR 929 (2018)).

Por otra parte, es menester señalar que las obligaciones pueden ser clasificadas de acuerdo con los sujetos que componen la relación. Así, existen obligaciones mancomunadas y solidarias. En las obligaciones mancomunadas, la deuda puede ser dividida y cada deudor cumple con su parte de forma independiente. Mientras que en las obligaciones solidarias el acreedor tiene derecho a pedir y cada deudor tiene el derecho de realizar íntegramente la prestación debida. Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 DPR 365, 375 (2012). Como regla general, la solidaridad no se presume, sino que esta última surge solo cuando la obligación expresamente lo determine. Cuando son obligaciones solidarias, "[e]l acreedor puede dirigirse contra cualquiera de los deudores solidarios o contra todos ellos simultáneamente. Las reclamaciones entabladas contra uno no serán obstáculo para las que posteriormente se dirijan contra los demás, mientras no resulte cobrada la deuda por completo." Art. 1907 del Código Civil, 31 LPRA sec. 3108.

Por último, es doctrina reiterada en nuestro ordenamiento que cuando los términos de un contrato son claros y están libres de toda ambigüedad, no dando margen, así, a alguna duda respecto a la intención de las partes, no cabe recurrir a las normas de interpretación contractual. Dichos términos contractuales, más bien, tendrán que hacerse valer según su tenor. Art. 1233 del Código Civil, 31 LPRA sec. 3471; Maffei Nazario v. Vélez, 145 DPR 508, 517 (1998); Marcial

8

v. Tome, 144 DPR 522, 536 (1997). En vista de lo anterior, cuando los términos de un contrato son claros y entiende a cabalidad lo pactado, no procede entrar a dirimir lo que las partes presuntamente quisieron pactar al momento de perfeccionarse el contrato en cuestión. Véase, C.F.S.E. v. Unión de Médicos, 170 DPR 443, 450 (2007). Se entiende por "términos claros" aquellos que por sí mismo son suficientes para ser entendidos en in unto sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y cuya comprensión no es susceptible de ser impugnada. Véase, Sucn. Ramírez v. Tribunal Superior, 81 DPR 357, 361 (1959).

### C. El contrato de préstamo

El contrato de préstamo es uno de carácter consensual, por lo que no se precisa para su perfeccionamiento algún otro requisito que no sean aquellos establecidos en el Artículo 1210 del Código Civil, a saber: objeto, consentimiento y causa. Art. 1210 del Código Civil, 31 LPRA sec. 3375. Por su parte, el Artículo 1631 del Código Civil dispone que "[p]or el contrato de préstamo, una de las partes entrega a la otra . . . dinero u otra cosa fungible, con condición de volver otro tanto de la misma especie y calidad . . .". Art. 1631 del Código Civil, 31 LPRA sec. 4511. Así, el contrato de préstamo es uno unilateral, dado que solo genera obligaciones a cargo del prestatario para con el prestamista. Véase, José R. Vélez Torres, *Curso de Derecho Civil. Derecho de Contratos* 455 (1997). Aquel que recibe el dinero dado en préstamo, pues, adviene dueño de éste, pero se obliga al repago de este, más el interés pactado y sujeto a las condiciones convenidas. Véase, Arts. 1644-1646 del Código Civil, 31 LPRA secs. 4571-4573. De otra parte, es meritorio puntualizar que el mero incumplimiento del deudor con los términos y condiciones pactadas supone la activación de las cláusulas penales que se hayan pactado. Véase, José Puig Brutau, *Fundamentos de Derecho Civil* 451-452, T. I (4ta ed. 1988). En lo que respecta al acreedor, éste podrá requerir el pago total de lo debido sin que tenga que aceptar pagos parciales. Véase, Art. 1123 del Código Civil, 31 LPRA sec. 3171. Esta prerrogativa del acreedor, pues, preserva la integridad de la deuda, lo que, a su vez, supone que la deuda no se entenderá extinguida hasta tanto se satisfaga en su totalidad. Véase, Art. 1111 del Código Civil, 31 LPRA sec. 3161.

### D. Cobro de dinero

En lo concerniente a una acción de cobro de dinero, la parte demandante solo tiene que probar diversos elementos, a saber, (i) la existencia de una deuda válida, (ii) que la misma no se ha pagado, (iii) que el reclamante es el acreedor y (iv) que los demandados son sus deudores. *Véase*, General Electric v. Concessionaries, Inc., 118 DPR 32, 43 (1986).

9

En las instancias en que la deuda es válida, el demandado tiene el peso probatorio respecto a las defensas de extinción de la obligación que presente. Para impugnar la cuantía monetaria, corresponde a la parte que alegue haber pagado probar la extinción de la obligación con evidencia fehaciente; como, por ejemplo, cheques cancelados, haber entregado al acreedor la totalidad del dinero debido. *Véanse*, Jiménez Vda. Cobián v. Ramos, 51 DPR 387, 398-399 (1937); Calas & Cla v. García, 8 DPR 476, 479 (1905). De igual forma, "si hay alguna duda [o] ambigüedad con respecto algún pago [o] novación, la parte que alegue la existencia de uno de estos dos procedimientos para extinguir la deuda, tiene el deber de probarlo". Calas & Cla v. García, 8 DPR, pág. 477.

Por otra parte, el artículo 1061 del Código Civil dispone que:

> Si la obligación consistiere en el pago de una cantidad de dinero y el deudor incurriere en mora, la indemnización de daños y perjuicios, no habiendo pacto en contrario, consistirá en el pago de los intereses convenidos, y a falta de convenio, en el interés legal
>
> Mientras que no se fije otro por el Gobierno se considerará como legal el interés del seis por ciento (6%) al año.

Art. 1061 Cód. Civ. PR, 31 LPRA sec. 3025.

### E. <u>Ejecución de garantías</u>

Sobre la hipoteca, una vez determinada la "obligación o deuda queda garantizada mediante la constitución de [un] *gravamen sobre un bien inmueble".* José Puig Brutau, Compendio de Derecho Civil 407, T. III (1989). Esto es, "[l]a hipoteca se concibe como un 'derecho real de realización del valor, en su función de garantía de una obligación pecuniaria, de carácter accesorio e indivisible, de constitución registral, que recae directamente sobre bienes inmuebles, ajenos y enajenables, que permanecen en la posesión del propietario'." Westernbank v. Registradora, 174 DPR 779, 784 (2008) (citando a J.M Chico y Ortiz, Estudios sobre Derecho Hipotecario 1282, T. III (3ra ed. 1994)); Liechty v. Descartes Saurí, 109 DPR 496, 500-502 (1980). Por tanto, "el contrato de hipoteca supone la existencia de dos figuras jurídicas, a saber, una obligación principal, y la hipoteca en sí, que sirva de garantía al acreedor de la primera. No se concibe una hipoteca sin obligación garantizada." R&G v. Registradora, 162 DPR 602, 607 (2004) (citas omitidas). Es decir, "[d]ada la naturaleza accesoria del derecho real de hipoteca, su vigencia no es independiente de la vigencia de la obligación principal." Westernbank v. Registradora, 174 DPR a las págs. 784-785; Banco Popular v. Registrador, 181 DPR 663, 672-673 (2011). Salvo defectos formales o

10

constitutivos que pudieran incidir en la validez de una hipoteca, se estará sujeto al contenido del crédito que garantiza.

### F. La Paralización Automática Aplica Únicamente en Cuanto a Azure

La protección de la paralización automática provista por la Sección 362(a) del Código Federal de Quiebras sólo protege al deudor quebrado. Así pues, otras partes, como fiadores, codeudores o garantizadores, no pueden invocar esta protección, aun cuando tengan un vínculo legal o de hecho con el quebrado. Véase, Cámara Insular v. Anadón, 83 D.P.R. 374, 380 (1961). En dicho caso, el Tribunal Supremo de Puerto Rico explicó el alcance de la paralización automática de la Sección 362(a):

> La responsabilidad de una persona que es codeudor, fiador o en alguna forma garantizador de un quebrado no se altera por la adjudicación en quiebra de éste. El propósito de la sección citada es proteger el ejercicio de cualquier acción que tenga el acreedor contra cualquier otra persona que se hubiere obligado conjuntamente con el deudor quebrado. En otras palabras, la iniciación del procedimiento de quiebra es una defensa personal que puede levantarse por el deudor peticionario únicamente, pero que no beneficia a los codeudores. A los fines de poder reclamar contra el codeudor solidario o fiador, es inmaterial que el acreedor pruebe su reclamación contra el deudor principal dentro del procedimiento de quiebra. Es más, puede probar su reclamación, recibir la parte proporcional que se adjudique a los acreedores, y dirigir entonces su acción por el balance contra el codeudor.

Id. a las págs. 380-81 (citas omitidas).

La petición de quiebra presentada por Azure paraliza las gestiones de cobro únicamente en su contra por las deudas incurridas por ella con anterioridad a la fecha de presentación de su petición. Se dictará sentencia sumaria parcial en contra de los codemandados Garantizadores que no están en quiebra, Alfonso Valdés García, Cost Control Company, Inc. y Fideicomiso Valdés Acevedo, toda vez que la paralización total del caso en cuanto a éstos es improcedente en derecho. Este Tribunal continuará los procedimientos contra Azure y resolverá la Solicitud de Sentencia Sumaria en su contra una vez el Tribunal de Quiebras notifique que se ha levantado la paralización automática contra Azure.

Los hechos incontrovertidos en este caso demuestran que: (i) las partes firmaron un Contrato de Préstamo, el cual fue admitido por los Demandados en su contestación a la Demanda y mediante el cual se definieron las obligaciones entre las partes, las cuales no están en controversia; (ii) los Demandados incumplieron con sus obligaciones bajo el Contrato de Préstamo; (iii) el Demandante notificó a los Demandados de su incumplimiento, acelerando la deuda en su totalidad conforme a los acuerdos entre las partes; y (iv) la deuda reclamada es vencida, líquida y exigible.

## SENTENCIA PARCIAL

De conformidad con las anteriores determinaciones de hechos y conclusiones de derecho, las cuales se hacen formar parte de la presente, se dicta sentencia declarando CON LUGAR la *Moción de Sentencia Sumaria* presentada por Triangle contra los Garantizadores, Fideicomiso Valdés-Acevedo, Cost Control Co., Inc. y el Sr. Alfonso Valdés por lo que se declara CON LUGAR la *Demanda* en contra de los Garantizadores[4]. En su consecuencia, se ordena a los Garantizadores al pago solidario de todas las cantidades reclamadas por Triangle hasta el día que sean satisfechas en su totalidad, y las cuales al 15 de octubre de 2022, ascienden a una suma no menor de $1,713,834.27, la cual se compone de las siguientes partidas: (i) $1,026,969.77 por concepto de principal; (ii) $487,810.65 por concepto de intereses acumulados, los cuales se siguen acumulando a razón de $235.35 diarios (*per diem*) hasta el pago total y completo de la obligación; (iii) $21,124.35 por recargos (iv) $175,000.00 por concepto de honorarios de abogado, según estipulado por las partes; (v) $644.00 por concepto de pólizas de seguro de la Propiedad Hipotecada; y (vi) $2,285.50 por gastos de valoración.

Advenida firme la Sentencia sin que los Garantizadores hayan satisfecho la totalidad de la misma, se ordena la venta y ejecución de las hipotecas dadas por los Garantizadores que garantizan las obligaciones de pago según relacionadas en esta Sentencia. Se ordena, además, la ejecución de las prendas y otros bienes muebles de los Garantizadores entregadas como garantías hasta tanto dichos bienes respondan por la cantidad adeudada y hasta que quede satisfecha cualquier deficiencia de la Sentencia dictada que no sea cubierta con el producto de la venta de las propiedades hipotecadas de los Garantizadores.

**REGÍSTRESE Y NOTIFIQUESE.**

En Fajardo, Puerto Rico, hoy 28 de marzo de 2023.

_____
JUAN A. ROBLES ADORNO
JUEZ SUPERIOR

---

[4] La Solicitud de Sentencia Sumaria presentada en contra de Azure será resuelta una vez el Tribunal de Quiebras notifique que se ha levantado la paralización automática en contra de ésta.